IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 21, 2011

**STATE OF TENNESSEE v. MICHAEL DEAN MARLIN**

**Appeal from the Circuit Court for Marshall County**
**No. 2010-CR-61     Robert G. Crigler, Judge**

---

**No. M2011-00125-CCA-R3-CD - Filed November 17, 2011**

---

The Defendant, Michael Dean Marlin, was found guilty by a Marshall County Circuit Court jury of three counts of especially aggravated burglary, a Class B felony; aggravated robbery, a Class B felony; robbery, a Class C felony; aggravated assault, a Class D felony; and assault, a Class A misdemeanor. The trial court merged the especially aggravated burglary convictions. The court sentenced the Defendant as a Range II, multiple offender to twenty years each for the especially aggravated burglary convictions and the aggravated robbery conviction, to ten years each for the robbery and the aggravated assault, and to eleven months and twenty-nine days for the assault, to be served concurrently for an effective twenty-year sentence. On appeal, the Defendant contends that the evidence is insufficient to support his convictions and that double jeopardy protections and Tennessee Code Annotated section 39-14-404(d) bar simultaneous convictions for aggravated robbery, especially aggravated burglary, and aggravated assault. We affirm the judgments for robbery and assault, but we reverse the especially aggravated burglary, aggravated assault, and aggravated robbery judgments and remand the case for entry of judgments in which the Defendant's convictions for especially aggravated burglary are modified to aggravated burglary and he is resentenced accordingly, and the conviction for aggravated assault is merged into a judgment of conviction for aggravated robbery.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part and Reversed in Part; Case Remanded.**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

William M. Haywood, Lewisburg, Tennessee, for the appellant, Michael Dean Marlin.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Chuck Crawford, District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to a home invasion during which Lones Allen Butler and LeAnn Taylor were attacked. LeAnn Taylor testified that she and Mr. Butler were a couple and that they lived together in his home in Marshall County. She said that Mr. Butler had surgery on his back, that he was prescribed morphine, Lortab pills, and Soma pills, and that he stored the medication in a lockbox under their bed. She said he also stored medication he was not currently taking in the laundry room. She said they did not sell drugs from their home.

Ms. Taylor testified that on December 13, 2009, she and Mr. Butler left their home to go grocery shopping and that when they returned around 6 p.m., they noticed that someone broke their bedroom window and moved their bed and the lockbox. They called the police after they noticed that medication was missing. Ms. Taylor said that the police took the lockbox when they left the house and that after they left, she and Mr. Butler realized that money had also been taken. She said $6600 was "stashed" around the home in four places because they were saving to take a vacation. She said that $5600 was missing but that $1000 remained in Mr. Butler's dresser drawer.

Ms. Taylor testified that the Defendant, Travis Lankford, and Laura Lankford came to her home later that night. Ms. Taylor stepped onto her front porch after she noticed a car back down her driveway toward the house. It was dark and she was unable to see who was in the car. She stated that Ms. Lankford stepped out of the car and said hello and that although she recognized Ms. Lankford's voice, she called out, "Laura, is that you?" She said that after Ms. Lankford confirmed her identity, she asked Ms. Lankford if Mr. Lankford was with her and was told that he was not. She said that she invited Ms. Lankford into the house and that Ms. Lankford did not indicate that anyone was with her. She said she did not invite the Defendant or Mr. Lankford into the house. She said that although she knew Mr. and Ms. Lankford, she did not know the Defendant. She said Mr. Lankford was not welcome in her home.

Ms. Taylor testified that moments after she returned inside, Mr. Lankford and the Defendant followed her into her home. She said Mr. Lankford rushed toward her, wrestled her to the floor, held her by her throat, and stated, "Where is it? I know you got more. I want more pills." She said that the struggle moved into the laundry room and that she handed Mr. Lankford bottles of medication in an attempt to stop the attack. She said that as she continued to fight with Mr. Lankford, she saw the Defendant in her bedroom removing

dresser drawers and emptying out the contents. She said the Defendant left the room, stated, "I've got it. Let's go," and ran out of the house with Mr. Lankford. She said that Mr. Lankford took the bottles of medication when he left and that the Defendant held something in his right hand, but she could not see what it was. She said she found Mr. Butler unconscious and bleeding on the bathroom floor and called 9-1-1. She said that Mr. Butler spent a month at Vanderbilt hospital, that he was in a coma for two weeks, and that he continued to suffer from his injuries at the time of the trial. She said she had a "busted lip" and many bruises after the attack.

Ms. Taylor testified that $1000 was missing from the dresser after the Defendant and Mr. Lankford left. She said that Mr. Butler collected knives and Zippo lighters, that he kept them in his dresser, and that they were missing after the Defendant and Mr. Lankford left. She said Mr. Butler's wallet was also missing.

Ms. Taylor testified that the bathroom window and a picture frame hanging over the toilet were broken during the attack. She identified photographs of the bathroom and said blood was on the wall near the picture frame and on the toilet. She identified four pill bottles and said that they appeared to be the bottles she gave Mr. Lankford but that she was not certain because each of the bottles had parts of the label removed, including the patient's name. One of the bottles was a blood pressure medication called Quinapril, and Ms. Taylor said Mr. Butler took blood pressure medication. She identified two lighters, including one shaped like a gun, and said they resembled the missing lighters owned by Mr. Butler. She identified two knives, including one with a picture on the handle, and said they resembled the missing knives owned by Mr. Butler.

On cross-examination, Ms. Taylor agreed that someone broke into her home around 4:00 or 5:00 p.m. on December 13, 2009, about three hours before the incident involving the Defendant. She agreed that Mr. Butler's lockbox was normally locked and kept at the foot of the bed but was found wedged between the bedroom window and the headboard of the bed. She said that she did not see Mr. Butler inspect the lockbox but that he told her medication was missing from the box. She said that $5600 was missing from their home after the first break-in and that the money had been hidden in envelopes beneath a chest in the closet, under their dresser, and under a nightstand. She said that $1000 remained in the top dresser drawer after the first break-in, but that the money was missing after the Defendant and Mr. Lankford invaded her home. She agreed that after the first break-in, the only thing she reported missing was medication. She said that she and Mr. Butler did not realize money was missing until after the police left and that Mr. Butler said he would tell the police about the missing money. She said dresser drawers were not pulled out or clothing dumped on the floor during the first break-in.

Ms. Taylor agreed that Ms. Lankford came to her home later that evening in a dark compact car but said she was unable to see if passengers were in the car. She said that she returned inside after inviting Ms. Lankford into the home and that she did not know if Ms. Lankford said anything to the Defendant or Mr. Lankford. She agreed that Mr. Lankford entered the house and attacked her and that she could not see the Defendant when he entered the home. She agreed she saw the Defendant in her bedroom while she fought with Mr. Lankford in the kitchen, but did not remember what the Defendant wore or if he had blood on him. She said that she did not see the Defendant leave the bedroom but that she saw him run by the kitchen and heard him say, "I've got it. Let's go." She said that after Mr. Butler was taken to the hospital, she returned to her bedroom with the police and realized that $1000 was missing from the dresser. She agreed that she told the police that money was missing but that she did not mention the medication, knives, or lighters. She agreed that she first realized the knives and lighters were missing when Detective Keith Jolley showed her a bag of items recovered from Ms. Lankford's car and she recognized the knives and lighters. She saw the knives and lighters in the drawer about two days before the Defendant and Mr. Lankford entered her home.

Ms. Taylor testified that after the break-in, she told the police that the Defendant had blonde hair, blue eyes, and weighed about 160 pounds. She said that she noticed the Defendant's blue eyes because he looked at her but that she did not get a good view of the rest of his face. She agreed she was not able to pick the Defendant out of a lineup shown to her by Detective Keith Jolley.

Ms. Taylor testified that the police never found Mr. Butler's wallet and agreed she was not positive that it was in the dresser before the Defendant entered her home. She agreed the four pill bottles she identified previously did not contain narcotics. She agreed that although she saw something in the Defendant's hand when he ran out of her home, she could not see what it was. She did not see the Defendant take medication bottles. She agreed that she gave various statements to the police and that she told them alternatively that $6000, $5600, and more than $3000 was taken during the second break-in. She said that $5600 was taken earlier in the day during the first break-in and that her math was not correct when she spoke with the police.

On redirect examination, Ms. Taylor testified that when she initially spoke with the police after the Defendant and Mr. Lankford left, she thought the police wanted her to state the combined amount taken from her home that day. She said that she was nervous and distraught after the break-ins and that she did not know why she wrote down that "$3000 plus" was missing. She said that she later realized she needed to separate the amounts stolen during the two incidents and that she clarified to the police that $1000 was taken during the second incident. She said she did not know how many bottles of medication she gave Mr.

Lankford or what they contained because Mr. Lankford was attacking her while she handed him the medication. She agreed she did not know who committed the first break-in.

On recross-examination, Ms. Taylor testified that she was about twenty feet from the Defendant when he looked at her and revealed his blue eyes. When defense counsel pointed out a man in the court room, Ms. Taylor said that the man was closer to her than the Defendant was when she saw the Defendant's eyes. She could not tell what color the man's eyes were.

Dr. Oliver Gunter, an expert in the field of medicine and emergency trauma surgery, testified that he was a surgeon and an assistant professor of surgery at Vanderbilt University Medical Center and that he cared for Mr. Butler. He identified Mr. Butler's medical records and said Mr. Butler arrived at the hospital shortly after midnight on December 14, 2009, and remained there until January 9, 2010. He said that Mr. Butler was unconscious for several days and that Mr. Butler had a fractured skull, a blood clot near his brain, cuts on his face, a fractured jawbone, and fractured ribs. He said that the rib and skull fractures, as well as the facial injuries, could have caused extreme physical pain and that the brain injury presented a substantial risk of death.

On cross-examination, Dr. Gunter testified that he was unaware that the attack caused Mr. Butler to have difficulty remembering things. He agreed Mr. Butler's injuries could potentially preclude memories of events before the attack. He was not able to determine what type of object caused the blunt force trauma to Mr. Butler's head but said falling into a window sill and then onto a toilet could cause injuries similar to Mr. Butler's. Dr. Gunter said he was told that Mr. Butler was taking morphine and Soma when he was admitted to the hospital.

On redirect examination, Dr. Gunter testified that Mr. Butler's skull and jaw fractures were on the right side of his head and that a significant amount of force would be required to cause the skull fracture. He said that Mr. Butler's rib fractures were on the left side and that Mr. Butler's injuries could not have been caused by a single blow.

Lones Alan Butler testified that he was fifty-seven years old and that he received disability benefits due to a work-related injury. He had back and shoulder surgery and took medication to control pain. He said that he had memory problems, that he did not remember the names of the medication he took, and that he could not remember what occurred on December 13, 2009. He said his memory problems began after he was attacked on December 13. He said that after he was released from the hospital, he began living with his brother because he was not able to return to his home and live independently. He said that he was not able to drive a car after the attack and that his injuries required regular visits to the

doctor. He was shown the knives and lighters that were previously introduced into evidence and said that although they looked like ones he owned, he could not be sure if they were his because many similar items were manufactured.

On cross-examination, Mr. Butler testified that the pain he experienced at the time of the trial was not caused by his work injury. On redirect examination, Mr. Butler testified that the pain was "crippling" and required medication. On recross-examination, Mr. Butler testified that although he remembered taking medication before December 13, 2009, he did not remember what he took or if he took morphine.

Sherman Butler testified that Lones Alan Butler was his brother. He received a telephone call on December 13, 2009, telling him that Lones Butler had been admitted to the hospital. He said that his brother was unconscious for ten days after being admitted, that his brother remained in the hospital for twenty-six days, and that he visited the hospital every day. He identified photographs that he took of his brother's injuries and said the police did not ask him to take the photographs. He said his brother had a broken nose, an "indentation" on the right side of his head, and cuts on the right side of his face near his ear, eye, and jaw. His brother also had cuts on his forehead and on the left side of his face near his ear. He did not see any injuries on the back of his brother's head. He said his brother was a different man after the attack. His brother had difficulty moving an arm, lost weight, could no longer drive a car, had to live with him, and took morphine, Gabapentin, Lortab, and Soma.

Marshall County Sheriff's Deputy Tony Nichols testified that at approximately 11:20 p.m. on December 13, 2009, he and Deputy Matt Owens responded to a break-in at the home of Mr. Butler and Ms. Taylor. He found Mr. Butler unconscious on the bathroom floor and an ambulance arrived minutes later to take Mr. Butler to the hospital. Deputy Nichols said Mr. Butler did not regain consciousness before being carried from the home. He said Ms. Taylor had an injured lip, a scrape on her cheek, and redness around her neck and chest. He photographed the home after speaking with Ms. Taylor. He said that the victims' bedroom was ransacked and that the dresser drawers were emptied onto the floor.

On cross-examination, Deputy Nichols testified that Ms. Taylor explained to him what happened to her during the break-in and told him that $5600, Mr. Butler's wallet, and medication were taken. When he responded to the home, he was aware that the victims reported an earlier break-in that day. When he asked her if anything was taken from the home, he did not think she was confused about whether he meant both break-ins or only the second. He said she told him that Mr. Lankford and another man entered her home and that the other man was around 5'9", weighed 160 pounds, and had blonde hair and blue eyes. He said she did not tell him that she saw the other man in the back bedroom.

Deputy Nichols testified that the bathroom window was broken, that he saw blood on the toilet, and that Mr. Butler had blood coming from his head. He did not see a trail of blood leading from the bathroom to other parts of the home or see blood on items near the dresser, but he said he was not looking for blood. He did not check the dresser for fingerprints and did not know if anyone else checked it for prints.

On redirect examination, Deputy Nichols agreed that Ms. Taylor was "distraught" when she spoke with the police shortly after the break-in and that he handed her a piece of paper and asked her to provide a written statement. He agreed she wrote that she saw the second intruder in her bedroom and that "$3000 plus all of [Mr. Butler's] meds" were taken. On recross-examination, Deputy Nichols testified that he did not respond to the first break-in at the victims' home and that he did not know if all of Mr. Butler's medication was taken during the first incident.

Steven Gentry testified that Ms. Lankford was his sister and that although he did not know the Defendant, he had seen the Defendant once or twice. He said that on the night of December 13, 2009, he was at his father's house with his brother, Ms. Lankford, Mr. Lankford, and the Defendant. He said that three days earlier, Mr. Lankford and the Defendant mentioned that they intended to rob someone but did not identify the victim. He said that on December 13, Mr. Lankford asked him if he wanted to help Mr. Lankford rob someone and that he refused to help. He said Mr. Lankford and the Defendant left a short time afterward with Ms. Lankford in her car. He said that when they returned an hour or two later, he had already received a telephone call from a friend telling him that the victims had been robbed. He did not call the police because he was scared and did not know what to do, but spoke with the police after they contacted him.

On cross-examination, Steven Gentry testified that he had ridden in his sister's car and that he thought he remembered the light inside the car not working. He said Mr. Lankford did not indicate who he wanted to rob.

Jerry Gentry, Jr., testified that he was Steven Gentry and Ms. Lankford's older brother. He said that he knew Mr. Lankford and that he had met the Defendant once or twice. He said that on the night of December 13, 2009, he, Steven Gentry, the Defendant, Mr. Lankford, and Ms. Lankford were at his father's house. He said that Mr. Lankford came to his bedroom and asked him if he wanted to accompany Mr. Lankford on a robbery. He said that the Defendant and Ms. Lankford were present during this conversation and that the Defendant constantly stated, "[L]et's go." He said they left his bedroom after he told Mr. Lankford that he did not want to be involved. He remained in his bedroom and did not see them leave the home or return.

On cross-examination, Jerry Gentry testified that Mr. Lankford did not indicate who he wanted to rob. He said Steven Gentry was in the living room during the discussion with Mr. Lankford and did not hear it.

Patricia Beard testified that Ms. Lankford was her daughter and that Steven and Jerry Gentry were her sons. She did not know the Defendant. She said that after the break-in, Mr. and Ms. Lankford left town and went to Alabama and that while they were there, Mr. Lankford was arrested and jailed. She said she traveled to Alabama and returned to Tennessee with Ms. Lankford in Ms. Lankford's car. She said that when she cleaned out the car the day after they arrived in Tennessee, she found four pill bottles, two knives, and two lighters under clothing in the back seat. She identified the items that were previously admitted into evidence as the same items she found in Ms. Lankford's car and said she had Ms. Lankford take the items to the Marshall County Sheriff's Office.

Patricia Beard testified that her niece, Ashley Beard, dated the Defendant and that she received a telephone call from her niece a day or two after the robbery. She said that she also spoke with the Defendant during the call and that the Defendant told her that Ms. Lankford was not involved with the break-in. She said the Defendant told her that he "walked in and I grabbed him up and I punched him in the face several times and I rammed his head in glass . . . I f---ed him up."

On cross-examination, Patricia Beard testified that although she did not know the Defendant and had not spoken with him before the telephone call, he told her what happened during the break-in. She said the Defendant did not tell her why he wanted to tell her about the break-in. On redirect examination, Particia Beard agreed the Defendant told her that Ms. Lankford did not participate in the break-in, take anything, or harm anyone.

Detective Keith Jolley testified that the first break-in occurred at the victims' home at 4:00 p.m. and that the second occurred at 11:00 p.m. He began looking for Mr. and Ms. Lankford and the Defendant after speaking with Ms. Taylor on December 14, 2009. He was not able to find Mr. and Ms. Lankford because they had traveled to Gulf Shores, Alabama. He said Patricia Beard brought him the medication bottles, lighters, and knives she found in Ms. Lankford's car.

Detective Jolley testified that the Defendant came to the sheriff's office on December 17, 2009, to turn himself in. He said that the Defendant was not injured except for cuts on his right hand and that the Defendant stated he cut his hand when he hit Mr. Butler. He said that he advised the Defendant of his rights and that the Defendant signed a waiver of his rights before the Defendant gave a written statement. He identified the statement and said he watched the Defendant write and sign the statement. He read the statement to the jury:

> Me, Travis, Laura, and Ashley were all drinking at the house having a good time. Travis asked me to go with him to get something. I thought it was beer, so I went with him and his girl. And we passed the store, so I asked where we were going. And he said to a friend's house to get something and I was cool with that. We get to the house, a girl came out of the house and yelled, who is that? And we told them – she said come in. And I was behind Travis as entering the house. As soon as we got to the door, Travis took off after the woman and threw her down. And I started freaking out and I saw a man look around the corner and ran into a room. So I went to make sure he wasn't getting a gun or anything. When I entered the door dude swung at me and missed and I pushed him back. Then he swung again and hit me in the face so I hit him and his head went into the window and he fell on the toilet. Then I ran out, picked Travis off of girl and told him we got to leave.

Detective Jolley agreed he had not spoken with anyone about the crime, other than Ms. Taylor and Sherman Butler, before the Defendant gave his statement.

Detective Jolley testified that he arrested the Defendant and called the prosecutor. He said that he and the prosecutor met with the Defendant later that night, advised the Defendant of his rights, had the Defendant sign a waiver of his rights, and obtained a second signed statement from the Defendant. Detective Jolley said that he wrote the Defendant's second statement and that it accurately portrayed what the Defendant said. He read the second statement to the jury:

> I, Michael Marlin, was at Ashley Beard's home in Chapel Hill with Travis Lankford and Laura Lankford. I, Michael, left the house with Travis and Laura. Laura was driving. Travis said we were going to settle a score, somebody ripped me off, are you with me? I said, I reckon. Travis looked back at me and said, are you sure you're with me. I said, sure, yeah. I did not know where I was going. We drove to the house. Laura got out of the car. The girl at the house came out on the porch and said, who is it? Laura answered by saying, it's Laura and Michael. The girl said, is Travis with you? Laura said, no. The girl went back in the house and said, come on in. All of us walked up to the door. Travis goes in the house and grabs the girl. Told me to get the guy. I went through the living room into the hallway,

opened the first door I came to, which was the bathroom. When I opened the door, the guy swung at me. I leaned back and he missed. Then I pushed him back. And he swung again and hit me on the left cheek. Then I hit him on the right side and his head went through the window and he landed on the toilet. I turned around and Travis said, get Alan. I said, he's knocked out. Travis said, get my sh--. I went to the back bedroom on the right, went through drawers, looking for the sh--. We were looking for pills and money. I got a Tootsie Roll piggy bank that looked like it might have two dollars in it. I couldn't find nothing. Travis said, I already got it, so let's go. Laura was in the car. We got in the car with Laura and left. We went back to Ashley's house. Travis told me to go to the back bedroom. Travis said I split it up and gave me five Lortabs and nine dollars. Then Travis left with Laura.

Detective Jolley agreed that the second statement was different from the first. He agreed that the Defendant admitted going to the victim's house to "settle a score," injuring Mr. Butler, searching through the dresser in the back bedroom and taking a piggy bank, and receiving five Lortab pills and nine dollars after the break-in.

On cross-examination, Detective Jolley agreed that Ms. Taylor was the first person he spoke with after the crimes and that she informed him that her home had been broken into twice on December 13, 2009. He agreed Ms. Taylor told him that $5600 and Mr. Butler's medication were taken during the first incident and that Mr. Lankford stated, "I know you got more" during the second incident. He said that on December 22, 2009, Patricia Beard brought him medication, lighters, and knives she found in Ms. Lankford's car. He said Patricia Beard did not inform him that the Defendant called her two days after the crimes and confessed to her that although he participated in the crimes, Ms. Lankford did not. He agreed his investigation revealed that Mr. and Ms. Lankford bought pills from Mr. Butler before the robbery.

Detective Jolley testified that he obtained a second statement from the Defendant because the prosecutor thought the first statement was not believable. He agreed that in both of the Defendant's statements, the Defendant said that he pushed Mr. Butler away after Mr. Butler threw the first punch and missed, that Mr. Butler hit the Defendant with a second punch before the Defendant hit Mr. Butler, and that after the Defendant hit Mr. Butler once, Mr. Butler fell into the window and then onto the toilet. He said that he did not think the evidence supported the Defendant's account of the incident and that he thought there was more of a struggle because in addition to the broken window, a picture frame on the wall was

-10-

broken. He agreed that Mr. Butler was unable to remember the incident and that there were no other witnesses to the incident. He said that he did not recover the Tootsie Roll piggy bank that the Defendant stated he took during the break-in and that Ms. Taylor did not know of any missing piggy bank.

On redirect examination, Detective Jolley testified that Ms. Lankford was the only person to inform him that she and Mr. Lankford bought pills from Mr. Butler before the break-in. He agreed that Mr. Lankford refused to speak with him and that Ms. Lankford wrote Mr. Lankford a letter in jail in which she told him what to say about the crimes. He agreed that the evidence did not confirm the Defendant's account of the incident with Mr. Butler because there was blood on the broken picture frame and on the wall.

Kellie Harris testified that she knew the Defendant through family and from meetings at the Duck River Racetrack. She said that before December 17, 2009, she went to the Defendant's home in an attempt to obtain her cousin's telephone number from the Defendant. She said that when he answered the door, he was "jumpy" and stated he thought Ms. Harris was a police officer because the police were looking for him. She said that she asked the Defendant what he had done and that he told her that he "beat this guy up . . . and they don't know if he's going to make it through." She said the Defendant told her that he hit the man twice in the bathroom and caused the man to go through the bathroom window. Ms. Harris agreed that she was not related to any of the witnesses in this case.

Ms. Harris agreed that the Defendant sent her a hand-written letter from the Marshall County jail and that he signed the letter. She read the letter to the jury:

> Kellie,
>        This is Michael Marlin. I was just wanting to talk to you about what had happened last December. I don't think you know the whole truth. I heard the stories that Leann was telling. She is not telling the truth. At least, not the whole truth.
>
>        Me, Travis, and Laura went up there to buy some pills. Well, me and Travis went in, leaving Laura in the car rolling a joint. Well, me and Travis bought some tabs and Leann got into it, argument. She got up in his face, then got to wrestling. Travis never did punch her or even hit her. Me and Alan tried to break it up. Then I hear Alan say something about a gun. I looked around seeing Alan going to the hallway. So I try and stop him. When I get to him, he starts to swing at me. I push him back and we end up in the bathroom. I wasn't trying to

-11-

fight or anything, but he would not stop swinging at me, so I ended up fighting. And one of the punches caught him right and he hit the window with his head and landed on the toilet. He was not bleeding, and looked like I had just knocked him out. I promise that I did not mean no harm. I didn't know that I did that much damage. And I still don't think that I did that much damage. But after, I went back and grabbed Travis and left.

We did not steal anything. They are trying to say that I stole money and then it went to knives and lighters. First she told the police that it was $5600 and then it went to $1000. And on top of that, my lawyer found out that they had reported that somebody broke into their house and they reported that somebody stole money and pills. And this happened hours before we went there on Sunday night.

I wish this never happened. You know that I'd never fight unless I have to . . . I feel real bad about Alan, though, too. I just want you to look at the whole picture before you go hating me for the rest of your life. I've known you for a long time. I know we never talk that much. I just always thought that you were out of my league from the first time I saw you at Duck River . . . . But just wanted you to know that I'm not that bad of a person. I turned myself in about hitting Alan when I found out that he was in the hospital. And I even hung myself when they told me that he wasn't going to make it on December 23. They even shipped me to mental health in Nashville. I can't stand somebody dying. Last time I went to jail, everybody was dying that I loved . . . .

Please don't hold no grudge against me, is all that I'm asking. Please write me back if you want to, but I wish you would. Thank you, Michael Marlin.

Upon this evidence, the jury found the Defendant guilty of three counts of especially aggravated burglary, and one count each of aggravated robbery, robbery, aggravated assault, and assault. He was sentenced as a Range II, multiple offender to twenty years each for the especially aggravated burglary convictions and the aggravated robbery conviction, to ten years each for the robbery and the aggravated assault, and to eleven months and twenty-nine

days for the assault, to be served concurrently for an effective twenty-year sentence. This appeal followed.

**I**

The Defendant contends that the evidence was insufficient to support his convictions because Ms. Taylor gave inconsistent statements regarding the crimes and effectively consented to the Defendant's entry into her home. He also argues that the evidence was not sufficient to support the aggravated assault conviction because he was defending himself from Mr. Butler. The State contends that the evidence was sufficient to support the Defendant's convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Pertinent to this appeal, especially aggravated burglary is the burglary of a habitation where the victim suffers serious bodily injury. T.C.A. § 39-14-404 (2010). A person commits burglary when he or she enters a building without the effective consent of the property owner and commits or attempts to commit a felony, theft, or assault. T.C.A. § 39-14-402(a)(3) (2010). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear," and aggravated robbery is robbery where the victim suffers serious bodily injury. T.C.A. §§ 39-13-401, -402(a)(2) (2010). For the purposes of a robbery conviction, the items may be taken directly from the victim or from "the victim's presence." State v. Miller, 608 S.W.2d 158, 160 (Tenn. Crim. App. 1980). Assault is the intentional, knowing, or reckless causing of bodily injury to another, and aggravated assault is the intentional, knowing, or reckless causing of serious bodily injury to another. T.C.A. §§ 39-13-101, -102(a) (Supp. 2009) (amended 2010). Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(a)(2) (2010). Serious bodily injury is bodily injury that involves protracted unconsciousness. T.C.A. § 39-11-106(a)(34)(B). A person is criminally responsible for an offense committed by another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the

-13-

person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2) (2010).

Taken in the light most favorable to the State, Steven Gentry testified that on the night of December 13, 2009, Mr. Lankford asked him if he wanted to help Mr. Lankford rob someone. Three days earlier, Mr. Lankford and the Defendant mentioned to Steven Gentry that they intended to rob someone. Jerry Gentry, Jr., testified that on the night of December 13, 2009, Mr. Lankford came to his bedroom and asked him if he wanted to accompany Mr. Lankford during a robbery. He said that the Defendant and Ms. Lankford were present during this conversation and that the Defendant constantly stated, "let's go."

Ms. Taylor testified that on December 13, 2009, Ms. Lankford, Mr. Lankford, and the Defendant came to her home in Ms. Lankford's car. Although Ms. Taylor invited Ms. Lankford into her home, she did not know that the Defendant and Mr. Lankford were also present and did not invite them inside. After the Defendant and Mr. Lankford entered the home, Mr. Lankford rushed toward Ms. Taylor, wrestled her to the floor, held her by her throat, and stated, "Where is it? I know you got more. I want more pills." She said that the struggle moved into the laundry room and that she handed Mr. Lankford bottles of medication in an attempt to stop the attack. As she continued to fight with Mr. Lankford, she saw the Defendant in the bedroom removing dresser drawers and emptying the contents. The Defendant left the room, stated, "I've got it. Let's go," and ran out of the house with Mr. Lankford. Mr. Lankford took bottles of medication when he left and the Defendant carried something in his right hand. Ms. Taylor testified that $1000, Mr. Butler's knives and lighters, and Mr. Butler's wallet were missing from the dresser after the Defendant and Mr. Lankford left. Although the home was broken into earlier in the day, Ms. Taylor said that $1000 remained in the top dresser drawer after the first break-in and that the money was missing after the Defendant and Mr. Lankford left her home.

Mr. and Ms. Lankford went to Alabama, where Mr. Lankford was arrested. Patricia Beard testified that she traveled to Alabama and rode back to Tennessee with Ms. Lankford in Ms. Lankford's car. She found four pill bottles, two knives, and two lighters in the back seat of Ms. Lankford's car. She identified the items she recovered from the car and said they were given to the police. Ms. Taylor identified four pill bottles and said that they appeared to be the bottles she gave Mr. Lankford during their struggle. She also identified two knives and two lighters and said they appeared to be Mr. Butler's missing items.

Patricia Beard testified that her niece, Ashley Beard, dated the Defendant and that she received a telephone call from her niece a day or two after the robbery. She said that she also spoke with the Defendant during the call and that the Defendant told her he punched Mr. Butler "in the face several times and I rammed his head in glass . . . I f---ed him up."

-14-

After the break-in, Ms. Taylor found Mr. Butler unconscious and bleeding on the bathroom floor. Mr. Butler spent a month at Vanderbilt hospital and was in a coma. Dr. Gunter testified that Mr. Butler was unconscious for several days and that Mr. Butler had a fractured skull, a blood clot near his brain, cuts on his face, a fractured jawbone, and fractured ribs. He said that the rib and skull fractures, as well as the facial injuries, could have caused extreme physical pain and that the brain injury presented a substantial risk of death.

Detective Jolley testified that the Defendant came to the sheriff's office on December 17, 2009, to turn himself in. He said that the Defendant was not injured except for cuts on his right hand and that the Defendant stated he cut his hand when he hit Mr. Butler. In a letter to Kellie Harris, the Defendant stated that he went to the victims' home to purchase pills. In signed statements witnessed by Detective Jolley, the Defendant stated that he went to the victims' home after agreeing to help Mr. Lankford "settle a score." The Defendant stated that he and Mr. Lankford entered Ms. Taylor's home and that Mr. Lankford ran toward Ms. Taylor and "threw her down." Mr. Lankford instructed the Defendant to "get" Mr. Butler. The Defendant admitted punching Mr. Butler in the face and then searching through Mr. Butler's dresser drawers for pills and money. He admitted taking a Tootsie Roll piggy bank containing money and said that after they left, he and Mr. Lankford split the proceeds and he received five Lortab pills and nine dollars.

Although the Defendant claims that Ms. Taylor's testimony does not support his convictions, we must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See Sheffield, 676 S.W.2d at 547. Ms. Taylor testified that she did not consent to the Defendant or Mr. Lankford entering her home. With regard to the aggravated assault conviction, the Defendant contends that the evidence supports an acquittal for self-defense and not a conviction for aggravated assault because he was defending himself from Mr. Butler. We disagree. A person has no duty to retreat and can use force against another "when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force," provided the person "is not engaged in unlawful activity and is in a place where the person has a right to be." T.C.A. § 39-11-611(b)(1) (2010). A claim of self-defense is not available when the real or apparent necessity to use force is brought about by the "design, fault or contrivance of the defendant." See Floyd v. State, 430 S.W.2d 888, 890 (Tenn. Crim. App. 1968). Here, the Defendant was engaged in unlawful activity and had no right to be in the victims' home when he struck Mr. Butler. Mr. Butler's attempts to defend his home and his spouse, and the Defendant's resulting use of force, was precipitated by the Defendant's unlawful home invasion. The Defendant is not entitled to a claim of self-defense.

With regard to the especially aggravated burglary convictions, the record reflects that the Defendant went to the victim's home to purchase drugs and help Mr. Lankford "settle a score." Mr. Lankford stated his intention to commit a robbery before going to the victim's home. The Defendant and Mr. Lankford attacked the victims during the home invasion and Mr. Butler suffered serious injury and protracted unconsciousness after being hit by the Defendant. With regard to the robbery conviction and aggravated robbery conviction, the record reflects that Mr. Lankford attacked Ms. Taylor and forced her to give him medication. The Defendant rendered Mr. Butler unconscious, searched Mr. Butler's dresser drawers for "pills and money," and admitted taking a Tootsie Roll piggy bank containing money. Knives, lighters, and $1000 were also taken from the dresser. With regard to the assault conviction, the record reflects that Mr. Lankford attacked Ms. Taylor, wrestled her to the floor, and held her by the throat. The Defendant assisted Mr. Lankford throughout the ordeal by accompanying him during the home invasion and by following Mr. Lankford's instructions to "get" Mr. Butler and retrieve items from the dresser. The Defendant also admitted to sharing in the proceeds of the home invasion.

We conclude that a rational trier of fact could have found beyond a reasonable doubt the elements of especially aggravated burglary, aggravated robbery, robbery, aggravated assault, and assault. We hold that the evidence is sufficient to support the Defendant's convictions.

## II

The Defendant contends that double jeopardy bars dual convictions for aggravated robbery and aggravated assault because they are based upon a single criminal act and share the same enhancing factor of serious bodily injury. He also argues that because he was prosecuted and convicted for aggravated robbery and aggravated assault, Tennessee Code Annotated section 39-14-404(d) prohibits a simultaneous conviction for especially aggravated burglary. The State concedes that dual convictions for aggravated robbery and aggravated assault violate the Defendant's constitutional guarantees against double jeopardy and that Tennessee Code Annotated section 39-14-404(d) bars dual convictions for especially aggravated burglary and aggravated robbery.

Aggravated assault predicated on causing serious bodily injury is a lesser included offense of aggravated robbery that is also predicated on the victim's suffering serious bodily injury, and it does not require proof of any additional element distinct from the elements of aggravated robbery when the victim suffers serious bodily injury. See State v. Swift, 308 S.W.3d 827, 832 n.6 (Tenn. 2010); State v. Vickie R. Herron and Wanda L. Griffin, No. 02C01-9702-CR-00067, Shelby County, slip. op. at 6 (Tenn. Crim. App. Dec. 31, 1998). The conviction for aggravated assault should be merged with the conviction for aggravated

robbery. We also note that although the jury convicted the Defendant of reckless aggravated assault, a Class D felony, the judgment of conviction mistakenly states that the conviction is a Class C felony and imposes the maximum ten-year sentence. In any event, this issue is rendered moot by our holding that the aggravated assault conviction must be merged into the judgment of conviction for aggravated robbery.

With regard to the Defendant's claim that Tennessee Code Annotated section 39-14-404(d) prohibits his convictions for especially aggravated burglary, the especially aggravated burglary statute states that "[a]cts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both." T.C.A. § 39-14-404(d). "Subsection (d) prohibits using the same act to prosecute for especially aggravated burglary and another offense." State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993); see also State v. Oller, 851 S.W.2d 841, 843 (Tenn. Crim. App. 1992). Here, the effect of subsection (d) is that the Defendant cannot be convicted of especially aggravated burglary and aggravated robbery when the serious bodily injury of Mr. Butler was an element of both offenses. See State v. Shanda Alene Wright, No. M2006-02343-CCA-R3-CD, Marshall County, slip op. at 9 (Tenn. Crim. App. Feb. 11, 2008) (holding that Tennessee Code Annotated section 39-14-404(d) precluded convictions for both especially aggravated burglary and especially aggravated robbery when serious bodily injury was an element of both offenses), app. denied (Tenn. Oct. 27, 2008). Accordingly, the Defendant's convictions for especially aggravated burglary must be modified to aggravated burglary, and we remand for resentencing on the aggravated burglary convictions. See id.; T.C.A. § 39-14-403 (2010).

In consideration of the foregoing and the record as a whole, we affirm the judgments for robbery and assault, but we reverse the especially aggravated burglary, aggravated assault, and aggravated robbery judgments and remand the case for entry of judgments and resentencing in accordance with this opinion.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE